**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**EXXONMOBIL OIL CORPORATION AND**
**EXXON MOBIL CORPORATION**

**CIVIL ACTION NO.: 25-CV-2001**

**JUDGE: JOLIVETTE BROWN**

**VERSUS**

**MARS OIL PIPELINE COMPANY LLC;**
**ET AL.**

**MAG. JUDGE: PHILLIPS**
**CURRAULT**

**JURY TRIAL DEMANDED**

---

**FIRST AMENDED COMPLAINT**

---

Plaintiff, ExxonMobil Oil Corporation ("**EMOC**") and Exxon Mobil Corporation ("**EMC**") (collectively, the "**Plaintiffs**"), respectfully submit this First Amended Complaint and represents as follows:

**NATURE OF THE ACTION**

1. EMOC and EMC file this First Amended Complaint to recover damages, in contract and in tort, caused by low pH and contaminated crude oil that was: (i) purchased and transported by EMOC; and (ii) received and processed at EMC's Baton Rouge Refinery.

**JURISDICTION AND VENUE**

2. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 43 U.S.C. § 1349(b), the Outer Continental Shelf Lands Act ("**OCSLA**") and the Court's supplemental jurisdiction. Specifically, this Court has federal question jurisdiction pursuant to the OCSLA, 43 U.S.C. § 1349(b)(1). On information and belief, as detailed herein, the claims asserted in this civil action arise out of and are related to operations, conduct and negligence that occurred at the Anchor Project, which is located approximately 140 miles from the Louisiana coast on the

1

U.S. Outer Continental Shelf. This Court has supplemental jurisdiction over the other state law claims asserted herein by EMOC and EMC, pursuant to 28 U.S.C. § 1367(a), as those claims arise out of the same set of operative facts as the claims over which this Court has federal question jurisdiction pursuant to the OCSLA, and are so related thereto as to form part of the same case or controversy under Article III of the United States Constitution. Louisiana state law applies as surrogate federal law under OCSLA in relation to the claims asserted herein as: (i) the controversy arises on a situs covered by OCSLA (the Anchor Project which is located on the outer continental shelf); (ii) Federal maritime law does not apply of its own force to these claims (as there is no connection between the claims at issue in this lawsuit and traditional maritime activity); and (iii) the state law underlying these claims is not inconsistent with Federal law. *Union Texas Petroleum Corp. v. PLT Eng'g, Inc*., 895 F.2d 1043, 1047 (5th Cir. 1990).

3.   Venue is proper in this Court pursuant to 43 U.S.C. §1349(b)(1), which provides that venue under OCSLA is proper "in the judicial district of the State nearest the place the cause of action arose."  Additionally, this Court is the designated venue in one of the contracts at issue herein.

## **PARTIES**

4.   Plaintiff herein, EMOC, is a New York corporation with its principal place of business in Texas. EMOC is one of the world's largest manufacturers and marketers of fuels and lubricants selling over 5.4 million barrels per day of petroleum products globally.  EMOC purchases crude oil from a variety of sources, domestic and international, to produce its petroleum products. EMOC contracts with parties that operate refineries, including EMC, to process and refine the crude oil EMOC has purchased into these petroleum products. A major source for EMOC's purchases of crude oil is US offshore production, including the Mars production stream.  The Mars production stream is a blend of crude oil produced from several platforms in the Mars Basin of the U.S. Gulf

Coast waters adjacent to Louisiana. The oil is transported through the Mars Crude Oil Pipeline system to onshore storage and refining facilities in Louisiana.

5. Plaintiff herein, EMC, is a New Jersey corporation with its principal place of business in Texas. EMC operates two United State Gulf Coast refineries at Baytown, Texas and Baton Rouge, Louisiana. These refineries process crude oil from a variety of sources, domestic and international, to produce petroleum products that meet specific design specifications. A major source of crude oil for the Baton Rouge Refinery feed is US offshore production, including the Mars production stream.

6. Defendant herein, Mars Oil Pipeline Company LLC ("**Mars**"), is a Delaware limited liability company with its principal place of business in Texas. Mars owns the Mars Pipeline system as an interstate pipeline system. This system provides service from Block 4 of the Bay Marchand Area in the offshore waters near Louisiana to connecting carriers in Clovelly, Lafourche Parish, Louisiana, the Fourchon terminal in Lafourche Parish, Louisiana, and LOOP Pipeline's Vessel Staging Capacity in Clovelly, Lafourche Parish, Louisiana. The Mars system also receives shipments of crude oil from the Amberjack Pipeline system in Fourchon, Lafourche Parish, Louisiana to connecting carriers in Clovelly, Lafourche Parish, Louisiana and LOOP's Vessel Staging Capacity in Clovelly, Lafourche Parish, Louisiana. On information and belief, the low pH and contaminated crude oil giving rise to the claims herein was transported on the Mars Pipeline system.

7. Defendant herein, Chevron U.S.A., Inc. ("**Chevron**"), is a Pennsylvania corporation with its principal place of business in Texas. Chevron is involved in various aspects of the oil and gas industry, including the exploration for and the production, refining, and marketing of crude oil and petroleum products. On information and belief, Chevron has a 62.86% controlling working interest

3

in the Anchor Project described in Paragraphs 18-24 of this Complaint.  On information and belief, the Anchor Project is the genesis of the low pH and contaminated crude oil giving rise to the damages and claims asserted herein.

8.  Defendant herein, TotalEnergies E&P USA, Inc. ("**TotalEnergies**"), is a Delaware corporation with its principal place of business in Texas. TotalEnergies is an energy company engaged in activities across many fields, including without limitation the production, refining, and marketing of crude oil and petroleum products. On information and belief, TotalEnergies has a 37.14% working interest in the Anchor Project described in Paragraphs 18-24 of his Complaint. On information and belief, the Anchor Project is the genesis of the low pH and contaminated crude oil giving rise to the damages and claims herein.

9.  Defendant herein, LOOP LLC, is a Delaware limited liability company with its principal place of business in Louisiana. LOOP LLC operates the LOOP system, consisting of a deepwater port, pipeline, and storage facility, and is engaged in the transport of crude oil through the LOOP system. LOOP LLC also operates the LOCAP Pipeline System.  On information and belief, the low pH and contaminated crude oil giving rise to the claims herein was transported through the LOOP system.

10. Defendant herein, Amberjack Pipeline Company LLC ("**APC**"), is a Delaware limited liability company with its principal place of business in Texas.  APC is the owner and operator of the Amberjack Pipeline system in the U.S. Gulf Coast waters adjacent to Louisiana. On information and belief, the low pH and contaminated crude oil giving rise to the claims herein was transported on the Amberjack Pipeline system.

11. Defendant herein, Shell Pipeline Company LP ("**SPC**"), is a Delaware limited partnership with is principal place of business in Texas. SPC is the majority owner and operator the Mars

Pipeline system. Again, on information and belief, the low pH and contaminated crude oil giving rise to the claims herein was transported on the Mars Pipeline system and the LOOP Pipeline system.

12. Defendant herein, LOCAP LLC, is a Delaware limited liability company with its principal place of business in Louisiana.  LOCAP LLC owns the LOCAP Pipeline which connects the LOOP LLC storage facility in Clovelly, Louisiana to the LOCAP Terminal in St. James, Louisiana. On information and belief, the low pH and contaminated crude oil giving rise to the claims herein was transported on the LOCAP Pipeline.

13. Defendant herein, Halliburton Company ("**HCO**"), is a Delaware corporation with its principal place of business in Texas. On information and belief, HCO and/or its wholly owned subsidiary (through Halliburton Holdings LLC) Halliburton Energy Services, Inc. were the contractor(s) that performed the well completion for the Anchor Project.

14. Defendant herein, Halliburton Energy Services, Inc. ("**HES**"), is a Delaware corporation with its principal place of business in Texas. On information and belief, HES and/or its parent HCO, were the contractor(s) that performed the well completion for the Anchor Project.

15. Defendant herein, SLB OneSubsea ("**SubSea**") is a joint venture of SLB, Aker Solutions, and Subsea7, with its principal places of business in both Oslo, Norway and Houston, Texas. On information and belief, SLB OneSubsea developed certain key subsea components of the Anchor Project.

16. Defendant herein, Wood Group USA, Inc. ("**Wood**") is Texas corporation with its principal place of business in Texas. On information and belief, Wood provided the fully integrated design for the Anchor Project, including topsides and subsea systems incorporating risers, production flowlines, export pipelines and flow assurance analysis.

## FACTUAL BACKGROUND

### *The Anchor Project*

17. On information and belief, on or about December 12, 2019, Chevron announced the sanctioning of the Anchor Project in the deepwater U.S. Gulf Coast waters adjacent to Louisiana. With a design capacity of 75,000 barrels of crude oil per day, the Anchor Project was developed as a seven well-subsea development and semi-submersible production unit, known as the Anchor Platform. The Anchor Project is located approximately 140 miles off the Louisiana coast on the U.S. Outer Continental Shelf. 43 U.S.C. § 1331. On information and belief, as detailed herein, the claims at issue in this lawsuit arise out of operations conducted at the Anchor Project located on the U.S. Outer Continental Shelf. 43 U.S.C. § 1349(b)(1).

18. On information and belief, the Anchor Project is a joint venture between Chevron and TotalEnergies.

19. On information and belief, Chevron holds 62.86% of the working interest in the Anchor Project, and TotalEnergies holds the remaining 37.14% of the working interest in the Anchor Project.

20. On information and belief, HCO and/or HES were the contractor(s) that provided well completion services in relation to the Anchor Project, including fluidization and mud engineering services.

21. On information and belief, SubSea developed certain key subsea components of the Anchor Project.

22. On information and belief, Wood provided the fully integrated design for the Anchor Project, including topsides and subsea systems incorporating risers, production flowlines, export pipelines and flow assurance analysis.

23. On information and belief, crude oil production from the Anchor Project commenced on or about August 12, 2024.

### *The Pipeline Network*

24. The Anchor Project consists of production wells that are tied into the Anchor platform. The Anchor platform is part of and tied into the network of pipelines used to carry crude oil being produced and/or transported through the U.S. Gulf Coast waters adjacent to Louisiana. As common carriers, the companies operating the various pipelines comprising this network of pipelines in the U.S. Gulf Coast adjacent to Louisiana operate under rate Tariffs approved by the Federal Energy Regulatory Commission ("**FERC**").

25. SPC/Mars own and operate the Mars Pipeline system as an interstate pipeline system providing service from Block 4 of the Bay Marchand Area in the offshore waters near Louisiana to connecting carriers in Clovelly, Lafourche Parish, Louisiana, the Fourchon terminal in Lafourche Parish, Louisiana, and LOOP Pipeline's Vessel Staging Capacity in Clovelly, Lafourche Parish, Louisiana under the rate Tariff LPSC Nos. 3.31 and 3.32. The Mars system also receives shipments of crude oil from the Amberjack Pipeline system in Fourchon, Lafourche Parish, Louisiana to connecting carriers in Clovelly, Lafourche Parish, Louisiana and LOOP LLC's Vessel Staging Capacity in Clovelly, Lafourche Parish, Louisiana under the rate Tariff LPSC Nos. 2.22 and 2.23 For all these movements, the Mars Pipeline system operates under the Rules and Regulations Tariff FERC LSPC No. 11.4.0.

26. EMOC is a past and current shipper of record of crude oil on the Mars Pipeline system and has taken interstate transportation service under the Rules and Regulations tariff LSPC No. 11.4.0, and the rates tariffs at LSPC Nos. 3.31.0, 3.32.0, 2.22.0 and 2.23.0.

27. The Mars Pipeline system delivers crude oil that is shipped through it to the LOOP Pipeline system. The crude oil is then transported through the LOOP Pipeline system to LOOP LLC's storage caverns in Clovelly, Louisiana. Customers of LOOP LLC can either: (i) throughput oil through LOOP LLC's transportation and storage system; or (ii) transfer ownership of/buy and sell crude oil being stored within the system.

28. LOCAP LLC's LOCAP Pipeline connects LOOP LLC's storage system in Clovelly, Louisiana to the LOCAP Terminal in St. James, Louisiana. The LOCAP terminal in St. James is connected by pipeline to the Exxon Anchorage terminal, which itself is connected to EMC's Baton Rouge Refinery.

29. Offshore crude oil that is owned/purchased by EMOC is transported through this network of pipelines for delivery to EMC's Baton Rouge Refinery, where, pursuant to contract, EMC refines the crude oil owned/purchased by EMOC and subsequently delivers to EMOC refined petroleum products for marketing and sale by EMOC.

30. Pursuant to that certain Terminal Throughput and Deficiency Agreement (the "**TTD Agreement**"), dated September 29, 2023, EMOC and LOOP LLC have contracted for EMOC to store and throughput its crude oil through LOOP LLC's system. A true and correct copy of the TTD Agreement is attached hereto as **Exhibit 1**.[1]

31. Pursuant to the terms of the TTD Agreement, LOOP LLC agreed to receive and store crude oil from EMOC and "make Commercially Reasonable Best Effort to deliver the Same Crude Petroleum to [EMOC] that was received by [EMOC]." **Exhibit 1**, at ¶4.5.

---

[1] Plaintiffs have filed simultaneously herewith their *Ex Parte* Motion to File Documents Under Seal With Incorporated Memorandum in Support, in which Motion Plaintiffs move this Court to file Exhibit 1 and the paragraphs of this Complaint which directly reference the terms of Exhibit 1 under seal.

*The Discovery of the Low pH and Contamination Issues*

32. EMOC arranged for the crude oil EMOC had purchased through the Mars production stream to be delivered to EMC's Baton Rouge Refinery for processing into refined crude oil products. Unbeknownst to EMOC and EMC, this crude oil was out-of-specification, based on general industry accepted practice, for use at the Baton Rouge Refinery due to its low pH and its contamination with zinc.

33. Through this transportation and delivery process, the low pH and contaminated crude oil became mixed with other non-contaminated crude oil also owned by EMOC, thereby physically damaging previously non-contaminated crude oil owned by EMOC.

34. Commencing mid-June 2025, EMC experienced upset conditions on the Baton Rouge Refinery crude distillation unit where crude oil enters the refinery and is distilled into feedstocks for all other processing at the refinery.  EMC experienced degraded performance of the desalter and changed pH in the multiple piping circuits.  The pH levels were outside of the operational envelope of the operating equipment in the crude distillation unit.

35. Low pH alone was a significant issue for EMC and refiners of crude oil because acidic conditions inside refinery pipes and vessels corrode and physically damage metal quicker resulting in a higher long-term risk for a process safety, reliability, or environmental incident.

36. The desalter upset conditions also result in a water carry over; an event which could cause a process safety or environmental incident.

37. Given these observed upset conditions, the Baton Rouge Refinery began testing crude oil for metals including zinc. Crude testing over the next week identified elevated levels of zinc in the barrels of crude oil product that had been received from the Mars Pipeline system (by way of the

9

LOOP Pipeline system and the LOCAP Pipeline). This testing revealed zinc levels ranging from 9.3 to 14.2 parts per million (ppm), well in excess of the general industry standard.

38. After discovery of the zinc metal in Mars, EMOC took crude oil samples from batches ran in earlier June known as "retains."  These crude oil samples are kept in case any issues occur for future testing. The samples EMOC retained from LOCAP and Mars Pipeline crude from earlier in June showed fluctuating levels of zinc throughout the month of June 2025, with zinc contamination spikes observed more frequently in the latter half of June.

39. Zinc is a metal that does not typically occur naturally in produced crude oil.  Zinc observed at elevated levels are an indicator of impure substances, such as those used in completion phase of wells (zinc bromide).

40. The presence of zinc amplified the operational challenges caused by the low pH crude oil, particularly in relation to desalter operations.

41. On June 26, 2025, EMOC sent notification to SPC, the controlling parent company and operator of Mars, that EMOC was measuring elevated levels of zinc in the crude oil.

42. EMOC followed up on this notification via emails to SPC on June 27, 29, and 30, 2025, each time requesting updates on the troubleshooting efforts SPC has undertaken and a timeline for resolution of the problem.

43. On July 1, 2025, EMOC sent a letter to SPC requesting additional information and providing a list of action items for SPC to undertake to address the problem of zinc contamination. A true and correct copy of this letter is attached hereto as **Exhibit 2**. EMOC left a voicemail with Shell Pipeline on July 1, 2025, following the sending of the letter to convey urgency. Shell Pipeline left EMOC a return voicemail on July 2, 2025, stating Shell was evaluating whether they may or may not be able to legally comply with EMOC's requests. They also referenced Mars Rules and

Regulations Section 25 stating the carrier is not responsible for monitoring receipts or deliveries for contaminants.

44. On July 3, 2025, SPC sent a response to EMOC's July 1, 2025 letter, stating that SPC, upon notification of the issue, had initiated due diligence procedures to investigate and address the issue. SPC, while noting that it was not responsible for controlling the quality of the crude oil that it ships, reminded EMOC that SPC may exclude relevant shippers from further entry into applicable segments of the pipeline system if off-spec products are found in the system.

45. Samples taken July 6, 2025, identified elevated levels of zinc in Poseidon. Subsequent samples of Poseidon and Southern Green Canyon crude identified the contamination source and was likely diluted into other grades after the initial identification in Mars crude oil.

46. On July 7, 2025, EMOC sent a follow-up letter to Shell Pipeline sharing EMOC's zinc sampling data and requesting any data that Shell Pipeline had collected to address the issue.

47. On July 10, 2025, EMOC and ExxonMobil Global Trading sent letters to all producers that might be affected by the zinc contamination, including Mars, other onshore pipeline operators, and affected refineries. EMOC shared its observations of ongoing zinc contamination in crude oil produced in the Gulf and transported on the Mars Pipeline system. EMOC also notified its trading partners that it would not accept crude oil from the Mars Pipeline if the zinc contamination continued.

### *Chevron Admits Responsibility*

48. On July 11, 2025, news reports emerged that Chevron had identified a "new well start-up" as the source of the contaminated crude oil transported through the Mars pipeline. By the end of the day on July 11, 2025, Mars/SPC stated that the contaminated zinc should be remedied by July 18, 2025.

49. While Chevron has not confirmed what was released into the Mars system, the observed operating conditions at the Baton Rouge Refinery and high levels of zinc measured in crude samples suggest an impure, zinc-based substance, such as zinc bromide, which is used in the completion phases of wells. The presence of zinc bromide in crude oil is known to cause desalter operational issues and results in the lowering of the pH level of crude oil.

50. If zinc bromide entered the crude oil stream during well completion, it likely operated to lower the pH of the crude oil and triggered the formation of hydrogen sulfide. In response, zinc-based scavengers were likely added to the crude oil to react with hydrogen sulfide (zinc-based scavengers function by reacting with hydrogen sulfide to form an insoluble zinc sulfide). However, the addition of these zinc-based scavengers would have had the effect of compounding the low-pH issue by increasing the overall levels of zinc in the crude oil and thereby increasing the low pH (acidity) of the crude oil by driving its overall pH lower.

51. While Chevron has not confirmed what was released into the Mars system that caused the zinc contamination, a substance such as zinc bromide, is acidic (low pH) as well as incompatible with crude oil. The observed operating conditions at the Baton Rouge Refinery included low pH in the refinery Pipestill unit piping and upset conditions in the desalter. The elevated levels of zinc measured in crude samples as well as observed refinery pH and desalter operation support the presence of an impure zinc-based substance in the refinery crude feed. Testing demonstrated that as the contaminated Mars crude rates were lessened, the pH and desalter operations both returned to within the operating envelope and to normal ranges.

52. On information and belief, the Anchor Project is more probably than not the source of the zinc contamination in the U.S. Gulf Coast pipeline network.

53. As of July 23, 2025, news reports indicated that Chevron's well and Mars Pipeline system had begun measuring zinc levels within accepted limits.

***Impact on EMOC***

54. EMOC's refinery's crude oil feedstock is the raw crude oil that is input for further processing to produce various products like fuels, lubricants, and petrochemicals. Reliable and consistent crude oil supply is necessary for a refinery to operate safely, efficiently and profitably. Contaminated crude oil disrupts refineries by damaging equipment through corrosion and fouling, causing shutdowns and financial losses due to reduced throughput and replacement costs.

55. From June 27, 2025, through July 13, 2025, EMOC purchased over 2000 KB of Mars crude oil. Of this purchased volume of Mars crude oil, over 70% of the Mars crude oil (over 1700 KB) was purchased at the LOOP LLC's storage facility located in Clovelly, Louisiana.

56. The low pH and contamination of the crude oil delivered through the Mars Pipeline system had a significant impact on EMOC's operations and caused physical damage to its property.

57. During transportation through the Amberjack Pipeline system and the Mars Pipeline system, and during storage at LOOP LLC's storage facility at Clovelly, Louisiana, the low pH and contaminated crude oil was mixed with crude oil owned by EMOC, thereby contaminating and damaging EMOC's crude oil. This contamination and damage to EMOC's crude oil placed the crude oil outside of the required specifications for safe use at EMC's Baton Rouge Refinery.

58. The mixing of the low pH and contaminated crude oil in the pipeline systems and at LOOP LLC's storage facility in Clovelly, Louisiana also caused crude oil to which EMOC took title at the LOOP LLC facility to be contaminated, damaged, and outside of the required specifications for safe use at EMC's Baton Rouge Refinery. EMOC relies upon its sellers and shippers that are

legally obligated to ensure that the crude oil it receives meets required specifications for use at the refineries that refine EMOC's crude oil into the refined products that EMOC markets and sells.

59. In order to make some economic use of the low pH and contaminated crude oil, and thereby mitigate its damages, EMOC was forced to dilute the low pH and contaminated crude oil with other crude oil owned by EMOC, in order to reduce the zinc levels in and raise the pH levels of the crude oil to acceptable levels for use. This necessary action caused economic loss to EMOC as it received less economic value from the crude oil which had to be used to dilute the low pH and zinc contaminated crude oil.

### *Impact on EMC*

60. The low pH and contaminated crude oil also caused significant disruptions at EMC's Baton Rouge Refinery. The low pH and contamination of the crude oil received at the Baton Rouge Refinery was not immediately discovered by EMC. Because the low pH and contamination were not immediately discovered, some of the low pH and contaminated crude oil was run through the Baton Rouge Refinery.

61. The low pH of the crude oil made the crude oil highly corrosive. Although the low pH issue was identified and measures were taken to mitigate the physical damage to the Baton Rouge Refinery and its systems and equipment within a reasonable amount of time, the corrosive nature of the low pH crude oil that was run through the systems and equipment at the Baton Rouge Refinery caused physical damage to those systems and that equipment.

62. Zinc is not naturally found in crude oil. Zinc has a physically damaging effect on refining equipment, particularly catalysts used in refining processes and other sensitive systems and equipment. Although the zinc contamination issue was identified and measures were taken to mitigate the damage to the Baton Rouge Refinery and its systems and equipment within a

14

reasonable amount of time, the zinc contaminated crude oil which was run through the systems and equipment at the Baton Rouge Refinery caused physical damage to those systems and that equipment.

63. Additionally, once the low pH and contamination were discovered, operations at the Baton Rouge Refinery were disrupted and refining volumes were necessarily reduced. The Baton Rouge Refinery equipment is engineered to run the blend of crude oil received through the Mars Pipeline system, which means unexpected pH levels and contaminants create operational challenges. In order to manage the unexpected contingency of low pH and elevated levels of zinc found in Mars crude, the Baton Rouge Refinery had to significantly reduce the Mars crude oil in the slate, which resulted in the refinery operating at a reduced capacity until different non-contaminated crude oil could be purchased and delivered to the Baton Rouge Refinery in such a way to ensure that it did not become contaminated by the Mars crude. When this different non-contaminated crude oil was delivered, this caused deoptimization of the crude slate resulting in economic losses for EMC. This also required the Baton Rouge Refinery to take out additional inventory positions, including increased tankage, to hold onto the contaminated Mars crude for an extended time.

64. Operation of the Baton Rouge Refinery at a reduced capacity not only caused EMC economic losses due to lost productivity and profits but also damaged the systems and equipment.

65. Additionally, operating the Baton Rouge Refinery at less than full capacity resulted in higher operational costs for EMC, as it increased the cost of maintenance and increased the energy usage during this period of operation.

66. Due to the operational issues at EMC's Baton Rouge Refinery, and in order to maintain stability in the Gulf Coast regional fuel supply chains during the peak season, the United States Department of Energy authorized the release of up to 1 million barrels of crude oil from the

Strategic Petroleum Reserve to EMOC under an exchange agreement. Under this exchange agreement, EMOC is obligated to eventually return the quantity of crude oil released to it from the Strategic Petroleum Reserve plus additional barrels. Accordingly, the zinc contamination of the crude oil received through the Mars Pipeline system caused EMOC to become obligated to the Department of Energy to return to the Strategic Petroleum Reserve not only the amount of crude oil that was released to EMOC, but also additional barrels, at EMOC's sole cost.

67. Further, EMC suffered damage to its business reputation because of the disruption of its operations at the Baton Rouge Refinery. The issues at the Baton Rouge Refinery, and the release of oil from the Strategic Petroleum Reserve to EMC, were widely reported in the press. These events and press stories damaged EMOC's business reputation, to EMC's pecuniary loss.

## CLAIMS

### Count 1: EMOC - Breach of the Warranty Against Redhibitory Defects
### (TotalEnergies and Chevron)

68. Plaintiffs incorporate by reference the prior paragraphs of this Complaint as though fully set forth herein.

69. TotalEnergies and Chevron are liable to EMOC for breach of the warranty against redhibitory defect, due to the low pH and contamination of the crude oil which was sold to EMOC.

70. Louisiana Civil Code art. 2520 provides as follows: "The seller warrants the buyer against redhibitory defects, or vices, in the thing sold. A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives the buyer the right to rescind the sale. A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but

for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price."

71. Louisiana Civil Code art. 2545 provides as follows: "A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use of fruits. **A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing**." (emphasis supplied).

72. Louisiana Civil Code art. 2450 provides as follows: "When more than one thing are sold together as a whole so that they buyer would not have bought one thing without the other or others, a redhibitory defect in one of such things gives rise to redhibition for the whole."

73. Louisiana Civil Code art. 2548 provides, in pertinent part, that "[t]he buyer is subrogated to the rights in warranty of the seller against other persons, even when the warranty is excluded." This legal subrogation of the buyer to the warranties of his seller against other person includes the warranty against redhibitory defects. The ultimate purchaser of a product can, therefore, recover against the original seller/manufacturer in redhibition, even though the ultimate purchaser is not in privity with the original seller/manufacturer, as the ultimate purchaser is subrogated to the rights of the original purchaser.

74. Here, the low pH and zinc contamination of the crude oil received by EMOC through the Mars Pipeline system rendered the use of the crude oil so inconvenient that EMOC would not have purchased it had it known of the defect.

75. The low pH and contaminated crude oil additionally damaged non-contaminated crude oil owned by EMOC when it was combined with EMOC's supply of non-contaminated crude oil for transport and processing.

76. TotalEnergies and Chevron are considered manufacturers under the law of redhibition, and are both, therefore, deemed to have knowledge that the crude oil which was sold had a redhibitory defect (*i.e.*, the low pH and zinc contamination).

77. By placing the low pH and zinc contaminated crude oil into the pipeline system, TotalEnergies and Chevron were declaring and/or representing that the crude oil had qualities which it did not have, namely that its composition/contents met the requirements of the applicable tariffs and generally accepted industry standards.

78. On information and belief, the low pH and contaminated crude oil originated from the Anchor Project. As owners of the Anchor Project, TotalEnergies and Chevron are manufacturers for redhibition purposes because, although crude oil is a commodity, they treat and modify crude oil at the well/platform prior to placing it into the pipeline network and into commerce. At the platform, the crude oil is separated from water and other contaminants, before being placed in the pipeline network for delivery to purchasers. In fact, it was TotalEnergies/Chevron's failure to remove and prevent the introduction of contaminants at the well/platform that appears to have caused the low pH and zinc contamination issues.

79. As manufacturers who are deemed to know of the existence of the redhibitory defect (the low pH and zinc contamination), Chevron and TotalEnergies are liable to EMOC for: (i) the return

of the price with interest from the time it was paid; (ii) the reimbursement of EMOC's reasonable expenses occasioned by the sale; (iii) EMOC's damages arising from the redhibitory defect, including lost profits and other consequential damages; and (iv) EMOC's reasonable attorneys' fees.

80. Further, as joint venturers in the Anchor Project, Chevron and TotalEnergies are (i) jointly and solidarily liable for the obligations of the joint venture and (ii) each vicariously liable for the tortious conduct of their co-venturer.

### Count 2: EMOC and EMC - Louisiana Products Liability Act Claim
### (LOOP LLC, TotalEnergies and Chevron)

81. Plaintiffs incorporate by reference the prior paragraphs of this Complaint as though fully set forth herein.

82. LOOP LLC, TotalEnergies, and Chevron are liable to EMOC and EMC under the Louisiana Products Liability Act, La. Rev. Stat. § 2800.51, *et seq.* (the "LPLA"), because the low pH and contaminated crude oil was unreasonably dangerous in its construction and/or composition, and EMOC and EMC suffered damages as a result of their reasonable use of the product.

83. Pursuant to La. Rev. Stat. § 2800.54(A), "[t]he manufacturer of a product shall be liable to a claimant for damages proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damages arose from a reasonably anticipated use of the product by the claimant or another person entity."

84. Under Louisiana law, a claim in redhibition and a claim under the LPLA may be brought in the same suit and need not be pleaded alternatively. *See, e.g., De Atley v. Victoria's Secret Catalogue, LLC*, 04-0661 (La. App. 4 Cir. 5/14/04), 876 So.2d 112.

85. A claim under the LPLA does not require personal injuries. Allegations that an unreasonably dangerous product caused damage to a party's property are sufficient to state a claim under the LPLA so long as the property that is damaged is not the unreasonably dangerous product itself. *See Stewart Interior Contractors, L.L.C. v. Metalpro Indus., L.L.C.*, 07-0251 (La. App. 4 Cir. 10/10/07), 969 So.2d 653, 670.

86. La. Rev. Stat. § 2800.54(B)(1) provides, in pertinent part, that a product is unreasonably dangerous if and only if "[t]he product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55[.]"

87. La. Rev. Stat. § 9:2800.55 provides that "[a] product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way form the manufacturer's specifications or performance standards for the product or from otherwise identical products made by the same manufacturer."

88. La. Rev. Stat. § 2800.53(1) defines a "manufacturer" for the purposes of the LPLA as meaning "a person or entity who is in the business of manufacturing a product for placement into trade or commerce[,]" as well as "[a] seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage[,]" and "[a] manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer."

89. La. Rev. Stat. § 2800.53(1) further provides that "manufacturing a product" means "producing, making, fabricating, constructing, designing, remanufacturing, reconditioning, or refurbishing a product."

90. La. Rev. Stat. § 2800.53(3) defines "product" for purpose of the LPLA as "a corporeal movable that is manufactured for placement into trade or commerce, including a product that forms a component part of or that is subsequently incorporated into another product or an immovable."

91. Here, TotalEnergies and Chevron are the "manufacturer" for purpose of the LPLA because: (i) they treated the crude oil at the well/platform for placement into trade or commerce; and (ii) they exercised control or influence over the quality of the low pH and contaminated crude oil which ultimately caused EMOC's damages. The low pH and contaminated crude oil is a "product" for purpose of the LPLA as it is corporeal movable that was manufactured (through treatment) by TotalEnergies and Chevron at the well/platform for placement into trade or commerce.

92. LOOP LLC is a "manufacturer" for purposes of the LPLA because it incorporated and blended the product of other crude oil suppliers with the low pH and contaminated crude oil from TotalEnergies/Chevron, and this blended product was subsequently sold to EMOC. *See* La. Rev. Stat. ¶ 9:2800.53(1).

93. LOOP LLC can also be considered a "manufacturer" for purposes of the LPLA because it is a "seller" under the LPLA that operated as a defector manufacturer. LOOP LLC may be considered a "seller" under the LPLA because it (i) had physical custody of the crude oil in its storage facility, and (ii) controlled the transaction process and delivery of crude oil through its terminal. *Packard v. Amazon.com, Inc.*, 23-01596 (La. 6/28/24), 387 So.3d 515, 523; La. Rev. Stat. § 2800.53(2). As a "seller," LOOP LLC is liable as a "manufacturer" under LPLA as it controlled and/or influenced the quality of the crude oil product which entered its storage facility. *See* La. Rev. Stat. § 2800.53(A)(b).

94. Here, the contaminated crude oil was an unreasonably dangerous product because of its unreasonably dangerous composition (low pH and containing zinc contaminants).

95. The presence of the low pH and contaminated crude oil was unreasonably dangerous and caused damage to non-contaminated crude oil that was purchased and owned by EMOC. The low pH and contaminated crude oil caused damage to this non-contaminated oil when it was combined with same, thereby contaminating the previously non-contaminated crude oil.

96. The low pH and contamination of the crude oil and the presence of the zinc contaminants in the crude oil was not only dangerous in relation to the system and equipment at EMC's Baton Rouge Refinery (to which it caused actual damage) but was also dangerous to the workers at EMC's Baton Rouge Refinery. The low pH of the crude oil and the presence of zinc contaminants in the crude oil received at EMC's Baton Rouge Refinery, if they had not been caught by EMOC/EMC so quickly, could have caused system and equipment failures which could have caused injury to EMOC's employees.

97. Accordingly, TotalEnergies, Chevron and LOOP LLC are liable to EMOC and EMC under the LPLA for all of EMOC's and EMC's damages proximately caused by the unreasonably dangerous low pH and contaminated crude oil which: (i) damaged EMOC's other non-contaminated crude oil; and (ii) which was ultimately delivered to EMOC's Baton Rouge Refinery with resulting damages.

98. Further, as joint venturers in the Anchor Project, Chevron and TotalEnergies are (i) jointly and solidarily liable for the obligations of the joint venture and (ii) each vicariously liable for the tortious conduct of their co-venturer.

### Count 3: EMOC and EMC - Negligence
### (Chevron and TotalEnergies)

99. Plaintiffs incorporate by reference the prior paragraphs of this Complaint as though fully set forth herein.

22

100.        Chevron and TotalEnergies owed duties of care to EMOC and EMC, which they negligently breached, to the resulting damage of EMOC and EMC. Accordingly, Chevron and TotalEnergies are liable to EMOC and EMC under Louisiana's law of negligence.

101.        Under Louisiana law, the same act can give rise to both contractual and tort claims. *Borden, Inc. v. Howard Trucking Co*., 454 So.2d 1081, 1096 (La. 1983).

102.        Louisiana Civil Code art. 2315 provides that "[e]very act of man that causes damage to another obliges him by whose fault it happened to repair it."

103.        In order to prevail on a negligence claim in Louisiana, a plaintiff must prove the following five elements: (i) The defendant had a duty to conform his conduct to a specific standard of care (duty); (ii) The defendant's conduct failed to conform to the appropriate standard of care (breach); (iii) The defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (cause-in-fact); (iv) The defendant's substandard conduct was the legal cause of the plaintiff's injuries (legal cause); and (v) The plaintiff was damaged (damages/injury). *In re Favret*, 17-0464 (La. App. 4 Cir. 6/1/18), 317 So.3d 470, 487, *writ denied*, 18-1262 (La. 10/29/18), 254 So.3d 1217.

104.        On information and belief, the contamination of the crude oil ultimately may have resulted from the completion of a well or wells as part of the Anchor Project and/or some other operations in relation to the Anchor Project. Chevron and TotalEnergies are the owners of the Anchor Project.

105.        As owners of the Anchor Project, that was tied into a larger common carrier system of pipelines, Chevron and TotalEnergies had the duty to exercise reasonable care to ensure that the performance of their work did not cause damage to the other users of the common carrier network and downstream recipients of crude oil from this network, including EMOC and EMC.

23

106. On information and belief, Chevron and TotalEnergies breached this duty by allowing or causing, through their negligence, the introduction from the Anchor Project of zinc contaminated completion fluid, or some other contaminant containing zinc, into the crude oil which was then introduced into the U.S. Gulf Coast pipeline network.

107. On information and belief, Chevron and TotalEnergies breached this duty by failing to procure an isolation strategy for acids used in the completion process of a well or wells on the Anchor Project, allowing these acids to be introduced into the crude oil which was then introduced into the U.S. Gulf Coast pipeline network.

108. On information and belief, Chevron and TotalEnergies further breached this duty, by negligently permitting or causing the introduction of zinc-based scavengers into the crude oil which was then introduced into the U.S. Gulf Coast pipeline network.

109. On information and belief, these negligent acts on the part of Chevron and TotalEnergies, caused, either individually or in combination, the crude oil originating from the Anchor Project to be out-of-specification owing to its low pH and contamination with zinc.

110. Additionally, Chevron and TotalEnergies owed a duty to EMOC and EMC, and other downstream purchasers and recipients, to not introduce contaminated crude oil into the pipeline network and into the commercial stream. Apart from and in addition to the general duty owed by Chevron and TotalEnergies to all persons (which duty they breached), Chevron and TotalEnergies, as shippers, owed a duty to EMOC, EMC, and other downstream recipients of crude oil from the pipeline network to ensure that the crude oil that they placed in that pipeline network conformed to the specifications set forth in the Rules and Regulation and rate tariffs governing the pipelines in the system.

111.    Rules and Regulations tariff LSPC No. 11.4.0, which governs movements on the Mars Pipeline system, at ¶25, provides that Mars had the right to reject crude oil "containing water, sediment and other impurities in excess of one percent" and/or crude oil "that has been contaminated by the existence of and/or excess amount of impure substances, including but not limited to . . . arsenic, lead, and/or **other metals which cause harm to** other Shippers, connecting carriers, **users of the contaminated [crude oil]** or Carrier." (emphasis supplied). Non Jurisdictional Tariff 13.12.0, which governs shipment on the Amberjack Pipeline system contains identical language at page 4 of its Rules and Regulations.

112.    FERC Tariff No. 12.28.0, governing shipment on the LOCAP pipeline, at Item No. 15, sets for the "Specifications As to Quality Received" requiring that crude oil shipped on the LOCAP pipeline be "[g]ood merchantable petroleum . . .[containing] not more than two percent (2%) of basic sediment, water, and **other impurities**[.]" (emphasis supplied). Item No. 15 further provides that "[n]o petroleum will be accepted unless its gravity, viscosity, and other characteristics are such that it will be readily susceptible to transportation through the Carrier's existing facilities, and will not materially affect the quality of other shipments or cause disadvantage to other shippers and/or the Carrier."

113.    These required specifications for shipments on these pipelines protect and create a duty in favor of EMOC, EMC and other downstream recipients of crude oil shipped on the U.S. Gulf Coast pipeline network.

114.    These required specifications ensure that crude oil shipped on these pipelines is not out-of-specification, contaminated, and/or damaged by contaminated crude oil being introduced into the pipeline system and mixed and blended with otherwise in-specification and non-contaminated crude oil.

115. These required specifications further ensure that the crude oil that is being mixed and blended in the system remains within the specifications necessary for safe use at the refineries that receive this crude oil. The operations of these refineries, including EMC's Baton Rouge Refinery, are designed and built to handle crude oil within these specifications, and deviations from these specifications in the crude oil supplied not only disrupt refinery operations, but they cause damage to refinery systems and equipment, and create potentially dangerous situations for the workers at these refineries.

116. By allowing the introduction of low pH and zinc contaminated crude oil into the pipeline network of the U.S. Gulf Coast waters adjacent to Louisiana, Chevron and TotalEnergies breached their duty to exercise reasonable care to ensure that they introduced into that network only crude oil that met the required specifications.

117. Chevron and TotalEnergies breach of this duty was a cause-in-fact and legal cause of the damages suffered by EMOC, including the physical damage to the non-contaminated crude oil that it owned and was transporting through the pipeline system, and the economic losses it suffered as a result.

118. Chevron and TotalEnergies breach of these duties was a cause-in-fact and legal cause of the damages suffered by EMC, including the physical damage to its crude oil and the systems and equipment at its Baton Rouge Refinery, and the economic losses it suffered as a result.

119. Additionally and/or alternatively, Chevron and TotalEnergies had the general duty to conform their standard of conduct in their operations to the standard of conduct of a reasonable person. Chevron and TotalEnergies breached this general duty by operating in an unreasonable manner and thereby introduction of low pH and zinc contaminated crude oil into the pipeline

network of the U.S. Gulf Coast waters adjacent to Louisiana. As set forth above, the breach of this duty caused damage, including physical damage, to both EMOC and EMC.

120.    Accordingly, Chevron and TotalEnergies are liable to EMOC and EMC for their damages caused by their negligence.

121.    Further, as joint venturers in the Anchor Project, Chevron and TotalEnergies are (i) jointly and solidarily liable for the obligations of the joint venture and (ii) each vicariously liable for the tortious conduct of their co-venturer.

### Count 4: EMOC and EMC - Negligence
*(Mars, LOOP LLC, Amberjack, LOCAP LLC, and SPC)*

122.    Plaintiffs incorporate by reference the prior paragraphs of this Complaint as though fully set forth herein.

123.    Mars, LOOP LLC, Amberjack, LOCAP LLC, and SPC all owed duties of care to EMOC and EMC, which duties they breached to the resulting damage of EMOC and EMC.

124.    As previously set forth herein, the tariffs governing movements on the Mars Pipeline system, the Amberjack Pipeline, and the LOCAP pipeline all provide for required specifications for the crude oil transported in these pipelines. These tariffs all provide for the right of the owners and operators of these pipelines, Mars, LOOP LLC, Amberjack, LOCAP LLC, and SPC to reject shipments of crude oil that do not meet these required specifications. These required specifications are in place not only to protect the pipelines themselves, but also to protect downstream purchasers and recipients of the crude oil, such as EMOC and EMC.

125.    Rules and Regulations tariff LSPC No. 11.4.0, which governs movements on the Mars Pipeline system, at ¶25, provides that Mars had the right to reject crude oil "containing water, sediment and other impurities in excess of one percent" and/or crude oil "that has been contaminated by the existence of and/or excess amount of impure substances, including but not

limited to . . . arsenic, lead, and/or **other metals which cause harm to** other Shippers, connecting carriers, **users of the contaminated [crude oil]** or Carrier." (emphasis supplied). Non Jurisdictional Tariff 13.12.0, which governs shipment on the Amberjack Pipeline system contains identical language at page 4 of its Rules and Regulations.

126.    FERC Tariff No. 12.28.0, governing shipment on the LOCAP pipeline, at Item No. 15, sets for the "Specifications As to Quality Received" requiring that crude oil shipped on the LOCAP pipeline be "[g]ood merchantable petroleum . . .[containing] not more than two percent (2%) of basic sediment, water, and **other impurities**[.]" (emphasis supplied). Item No. 15 further provides that "[n]o petroleum will be accepted unless its gravity, viscosity, and other characteristics are such that it will be readily susceptible to transportation through the Carrier's existing facilities, and will not materially affect the quality of other shipments or cause disadvantage to other shippers and/or the Carrier."

127.    Louisiana Public Service Commission ("LPSC") Tariff No. 2.23.0 governs the transportation of petroleum on the Amberjack Pipeline System from Fourchon to: (i) connecting carriers at Clovelly, Louisiana; (ii) the Fourchon Terminal (Chevron), Lafourche Parish, Louisiana; and (iii) LOOP's Vessel Staging Capacity at Clovelly, Louisiana. LSPC Tariff No. 2.23.0 is governed by Rules and Regulations tariff LPSC No. 11.4.0. LPSC No. 11.4.0 provides, at item 25 thereof, that Mars reserves the right to reject "Petroleum containing water, sediment and other impurities totaling in excess of one percent (1%) as determined by industry accepted tests[.]" LPSC No. 11.4.0 further provides that Mars "reserves the right to require, approve or reject the injection of corrosion inhibitors, viscosity or pour point depressants or other such additives in Petroleum to be transported."

128.     These required specifications for shipments on these pipelines protect and create a duty in favor of EMOC, EMC and other downstream recipients of crude oil shipped on the U.S. Gulf Coast pipeline network. The low pH and contaminated shipments contained impurities well above industry accepted concentrations, as revealed by testing at the Baton Rouge Refinery.

129.     These required specifications ensure that crude oil shipped on these pipelines is not out-of-specification, contaminated, and/or damaged by contaminated crude oil being introduced into the pipeline system and mixed and blended with otherwise non-contaminated crude oil.

130.     These required specifications further ensure that the crude oil that is being mixed and blended in the system remains within the specifications necessary for safe use at the refineries that receive this crude oil. The operations of these refineries, including EMC's Baton Rouge Refinery, are designed and built to handle crude oil within these specifications. Deviations from these specifications in the crude oil supplied not only disrupt refinery operations, but they cause damage to refinery systems and equipment and create potentially dangerous situations for the workers at these refineries.

131.     Mars, LOOP LLC, Amberjack, and LOCAP LLC as the owners and/or operators of these pipelines, owed a duty to EMOC, EMC, and other downstream recipients of crude oil shipped on the U.S. Gulf Coast pipeline network, to exercise reasonable care and exercise their right to reject these low pH and contaminated shipments of crude oil, as these shipments did not meet the required specifications of the applicable tariffs.

132.     SPC is the operator of the Mars Pipeline and the LOOP Pipeline. As the operator of these pipelines, SPC also owed the duty to EMOC and EMC to ensure that reasonable care was exercised and that the low pH and contaminated shipments of crude oil were rejected by the Mars Pipeline and the LOOP Pipeline.

29

133.      The negligent failure of Mars, LOOP LLC, Amberjack, LOCAP LLC, and SPC to reject the low pH and contaminated shipments of crude oil resulted in this low pH and contaminated crude oil becoming mixed with EMOC's otherwise in-specification and non-contaminated crude oil, causing physical and economic damage. As such, the negligent failure of Mars, LOOP LLC, Amberjack, and LOCAP LLC to reject the low pH and zinc contaminated shipments of crude oil is a cause-in-fact and legal cause of the damages suffered by EMOC.

134.      The negligent failure of Mars, LOOP LLC, Amberjack, LOCAP LLC, and SPC to reject the low pH and contaminated shipments of crude oil resulted in this crude oil reaching EMC's Baton Rouge Refinery, where it caused both physical and economic damage. As such, the negligent failure of Mars, LOOP LLC, Amberjack, and LOCAP LLC to reject the low pH and contaminated shipments of crude oil is a cause-in-fact and legal cause of the damages suffered by EMC.

135.      Additionally and/or alternatively, Mars, LOOP LLC, Amberjack, LOCAP LLC, and SPC all had the general duty to conform their standard of conduct in their operations to the standard of conduct of a reasonable person. Mars, LOOP LLC, Amberjack, LOCAP LLC, and SPC breached this general duty by operating in an unreasonable manner and thereby permitting (i) the low pH and contaminated shipments of crude oil to become mixed with EMOC's otherwise in-specification and non-contaminated crude oil, causing physical and economic damage, and (ii) the low pH and contaminated shipments of crude oil to reach EMC's Baton Rouge Refinery, where it caused both physical and economic damage.

136.      Accordingly, Mars, LOOP LLC, Amberjack, LOCAP LLC, and SPC are liable to EMOC and EMC for their damages suffered because of their negligence.

### *Count 5: EMOC and EMC - Negligence*
### *(HCO, HES, SubSea, and Wood)*

137.     Plaintiffs incorporate by reference the prior paragraphs of this Complaint as though fully set forth herein.

138.     HCO, HES, SubSea, and Wood all owed duties of care to EMOC and EMC, which duties they breached to the resulting damage of EMOC and EMC.

139.     On information and belief, the low pH and contamination of the crude oil may have resulted from the completion of a well or wells as part of the Anchor Project and/or some other operations in relation to the Anchor Project. HCO, HES, SubSea, and Wood were all contractors, engaged in varying capacities, on the work performed on the Anchor Project.

140.     As they were working on facilities/infrastructure that was tied into a larger common carrier system of pipelines, HCO, HES, Subsea, and Wood had the duty to exercise reasonable care to ensure that the performance of their work did not cause damage to the other users of the common carrier network and downstream recipients of crude oil from this network, including EMOC and EMC.

141.     On information and belief, HCO, HES, SubSea, and/or Wood breached this duty by allowing or causing, through their negligent work on the Anchor Project, the introduction of zinc contaminated completion fluid, or some other contaminant containing zinc, into the crude oil which was then introduced into the U.S. Gulf Coast pipeline network.

142.     On information and belief, HCO, HES, SubSea, and/or Wood breached this duty by failing to procure an isolation strategy for acids used in the completion process, allowing these acids to be introduced into the crude oil which was then introduced into the U.S. Gulf Coast pipeline network.

143. On information and belief, HCO, HES, SubSea, and/or Wood further breached this duty, by their negligent work, by permitting or causing the introduction of zinc-based scavengers into the crude oil which was then introduced into the U.S. Gulf Coast pipeline network.

144. On information and belief, these negligent acts on the part of HCO, HES, SubSea, and/or Wood, caused, either individually or in combination, caused the crude oil originating from the Anchor Project to be out-of-specification owing to its low pH and contamination with zinc.

145. This out-of-specification low pH and zinc contaminated oil became mixed with EMOC's otherwise non-contaminated crude oil and was run through EMC's Baton Rouge Refinery.

146. As a result, the negligent introduction of this contamination into the crude oil by HCO, HES, SubSea, and/or Wood is a cause in fact and legal cause of the damages suffered by EMOC and EMC because of said contamination.

147. Accordingly, HCO, HES, Subsea, and/or Wood are liable to EMOC and EMC for their damages suffered because of their negligence.

### *Count 6: Breach of Contract*
### *(LOOP LLC)*

148. Plaintiffs incorporate by reference the prior paragraphs of this Complaint as though fully set forth herein.

149. Under the terms of the TTD Agreement, LOOP LLC agreed to store and throughput EMOC's crude oil through LOOP LLC's system. *See* **Exhibit 1**.

150. Pursuant to the terms of the TTD Agreement, LOOP LLC agreed that it would receive and store crude oil from EMOC and "make Commercially Reasonable Best Effort to deliver the Same Crude Petroleum to [EMOC] that was received by [EMOC]." **Exhibit 1**, at ¶4.5.

151.     The TTD Agreement provides that Louisiana law shall govern the contract and designates this Court as the exclusive venue for disputes arising out of the agreement. **Exhibit 1**, at ¶¶ 14.1 and 14.2.

152.     Under Louisiana law, which governs the TTD Agreement, the essential elements of a breach of contract claim are: (i) the obligor's undertaking an obligation to perform (the contract); (ii) the obligor failing to perform the obligation (the breach); and (iii) the failure to perform resulting in damages to the obligee (damages). *Denham Homes, L.L.C. v. Teche Fed. Bank*, 14-1576 (La. App. 1 Cir. 9/18/15), 182 So.3d 108, 118; *see also* La. Civ. Code art. 1994.

153.     LOOP LLC breached its obligations under the TTD Agreement by failing to exercise "Commercially Reasonable Best Efforts" to deliver to EMOC the same crude oil which EMOC deposited into LOOP LLC's system for storage.

154.     LOOP LLC's breach of its obligations to EMOC resulted in damage to otherwise non-contaminated crude oil owned by EMOC, resulting in EMOC having to incur unexpected additional costs and resulting in lost profits for EMOC.

155.     The primary principal of law of damages for breach of contract is to place the plaintiff in the same position which he would have been had the breach of contract not occurred. *Sec. Nat. Bank of Shreveport v. Terrell*, 459 So.2d 131, 136 (La. App. 2 Cir. 1984). Lost profits are an item of damages recoverable for breach of contract. *Landry v. Bourque*, 460 So.2d 33, 34 (La. App. 1 Cir. 1984), *writ denied*, 464 So.2d 1378 (La. 1985).

156.     Additionally, because of LOOP LLC's breach of the contract, EMOC suffered damages to its business reputation due to the wide publicity that the operational issues and disruptions at EMC's Baton Rouge Refinery received. This publicity, occasioned by LOOP LLC's breach of the contract, damaged EMOC's reputation as a producer and marketer of petroleum

products. This damage to EMOC's reputation was a foreseeable consequence of LOOP LLC's breach of the contract, as it was foreseeable that EMC would suffer operational upsets due to contaminated crude oil being delivered to its Baton Rouge Refinery, that these disruptions would reflect negatively on EMOC since it was utilizing EMC's services to refine its petroleum products, and, given EMOC's and EMC's visible and important positions in the petroleum refining industry, that these operational upsets would garner publicity and damage EMOC's reputation.

157.    Accordingly, LOOP LLC is liable to EMOC for damages resulting from its breach of the TTD Agreement. EMOC is entitled to damages in the measure necessary to place itself in the same position which it would have occupied had LOOP LLC not breached the contract, including all additional costs and lost profits occasioned by LOOP LLC's breach of the TTD Agreement.

## ALTERNATIVE PLEADING

158.    Plaintiffs plead all the claims set forth herein additionally. To the extent that any of the claims set forth herein are incompatible with one another or may not be pleaded additionally, these claims should be understood to be pleaded in the alternative.

159.    Plaintiffs seek all damages to which it is entitled in relation to the claims pleaded herein. Plaintiffs do not, and this pleading should not be construed to, seek double recovery in relation to any particular measure of damages sought herein.

## RESERVATION OF RIGHTS

160.    Plaintiffs reserve their rights to collect and will introduce evidence, at trial or other hearing in this matter of (a) any other damages which have accrued during the pendency of this action; and (b) any other remedies available under any agreements or applicable law.

## DEMAND FOR TRIAL BY JURY

161.     Pursuant to Federal Rules of Civil Procedure 38(b) and 5(d), Plaintiffs hereby exercise their rights under the Seventh Amendment to the United States Constitution and demand a trial by jury. Pursuant to Local Rule 38 of this Court, words indicating Plaintiffs' demand for jury trial have been included in the caption of this pleading.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, EMOC and EMC pray for judgment in their favor and against the defendants named herein as follows:

(i)      Finding Chevron and TotalEnergies liable to EMOC for the breach of the warranty against redhibitory defects and finding them liable for this breach and casting them in judgment for all of EMOC's damages arising from this breach of said warranty, as those damages will be proven at trial, including without limitation all of EMOC's reasonable expenses, EMOC's lost profits, and EMOC's reasonable attorneys' fees;

(ii)     Finding Chevron, TotalEnergies, and LOOP LLC liable to EMOC and EMC under the Louisiana Products Liability Act, La. Rev. Stat. § 2800.51, *et seq*., and finding them liable for this claim and casting them in judgment for all of EMOC's damages proximately caused by EMOC's and EMC's reasonably anticipated use of the contaminated crude oil, as those damages will be proven at trial;

(iii)    Finding Chevron, TotalEnergies, LOOP LLC, Mars, Amberjack, SPC, LOCAP LLC, HCO, HES, SubSea, and Wood to have been negligent and finding them liable to EMOC and EMC for this negligence and casting them in judgment for all of EMOC's and EMC's damages occasioned by their negligence;

(iv)    Finding LOOP LLC to have breached the TTD Agreement and finding them liable

to EMOC for and casting them in judgment for EMOC's damages arising from this

breach;

(v)    Prejudgment and legal interest as permitted by law; and

(vi)    Awarding to EMOC and EMC all additional relief to which they may be entitled in

law or equity.

Respectfully submitted,

**BIENVENU, FOCO & VIATOR, LLC**

_/s/ Henry S. Rauschenberger_
David M. Bienvenu, Jr. (#20700)(T.A.)
F. Charles Marionneaux (#18320)
John Allain Viator (#25915)
Henry S. Rauschenberger (#37834)
4210 Bluebonnet Blvd.
Baton Rouge, LA 70809
Phone: (225)388-5600
Fax: (225)388-5622
david.bienvenu@bblawla.com
chip.marionneaux@bblawla.com
john.viator@bblawla.com
henry.rauschenberger@bblawla.com

*Attorneys for ExxonMobil Oil Corporation*
*and Exxon Mobil Corporation*

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that on this the 16th day of January, 2026, the above and foregoing was served on all counsel of record by operation of this Court's CM/ECF system. Undersigned counsel further certifies that the above and foregoing will be served on all parties who have not yet made an appearance in this proceeding in compliance with the law and the Federal Rules of Civil Procedure.

_____/s/ Henry S. Rauschenberger____
Henry S. Rauschenberger