**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **EXXONMOBIL OIL CORPORATION, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **CASE NO. 25-2001** |
| **MARS OIL PIPELINE COMPANY, LLC, ET AL.** | **SECTION: "G"(2)** |

**ORDER AND REASONS**

Before the Court are a Motion to Dismiss[1] filed by Defendant TotalEnergies E&P USA, Inc. ("TotalEnergies") and a Motion to Dismiss[2] filed by Defendant Chevron U.S.A., Inc. ("Chevron"). In this litigation, Plaintiffs ExxonMobil Oil Corporation ("EMOC") and Exxon Mobil Corporation ("EMC") (collectively, "Plaintiffs") bring claims against Defendants Mars Oil Pipeline Company, LLC ("Mars"), Chevron, TotalEnergies, LOOP, LLC ("LOOP"), Amberjack Pipeline Company, LLC ("APC"), Shell Pipeline Company, LP ("SPC"), LOCAP, LLC ("LOCAP"), Halliburton Energy Services, Inc. ("HES"), Wood Group USA, Inc. ("Wood"), and OneSubsea, LLC ("SubSea") (collectively, "Defendants"), to recover damages for allegedly contaminated crude oil[3] that it purchased and/or received from Defendants.[4] TotalEnergies and Chevron move the Court to dismiss the claims against them, asserting that Plaintiffs fail to state a

---

[1] Rec. Doc. 79.

[2] Rec. Doc. 85.

[3] The terms "crude oil" and "petroleum" are used interchangeably in the parties' briefings and in this Order and Reasons.

[4] Rec. Doc. 65.

1

plausible claim for relief.[5] Plaintiffs oppose the motions.[6] Having considered the motions, the memoranda in support and in opposition, the record, and the applicable law, the Court denies the motions.

## I. Background

In the Amended Complaint, Plaintiffs allege that crude oil purchased by EMOC and transported to EMC's Baton Rouge Refinery had low pH levels and was contaminated with zinc, which was mixed with previously non-contaminated crude oil owned by EMOC, thereby "physically damaging" EMOC's non-contaminated crude oil and causing "upset conditions" at the Baton Rouge Refinery.[7] Plaintiffs allege that the crude oil was produced by the Anchor Project[8] and passed through a network of pipelines whereby it was delivered to EMC's Baton Rouge Refinery.[9]

Plaintiffs detail each Defendant's alleged involvement in the Anchor Project and the pipeline network that transported the allegedly contaminated crude oil as follows: the Anchor Project is a joint venture between Chevron and TotalEnergies, with each company holding a working interest in the project; HES performed the well completion for the Anchor Project; SubSea developed certain key subsea components of the Anchor Project; Wood provided the design for the Anchor Project; Mars owns the Mars Pipeline System; SPC is the controlling parent company and operator of Mars; LOOP operates the LOCAP Pipeline System and owns the LOOP

---

[5] Rec. Docs. 79, 85.

[6] Rec. Docs. 87, 89.

[7] Rec. Doc. 65 at 9.

[8] The Anchor Project is an offshore oil well facility located approximately 140 miles from the Louisiana Coast on the U.S. Outer Continental Shelf. Rec. Doc. 65 at 6.

[9] Rec. Doc. 65 at 9–10.

Pipeline System, consisting of a deepwater port, pipeline, and storage facility; APC owns the Amberjack Pipeline System; and LOCAP owns the LOCAP Pipeline.[10] Plaintiffs allege that the contaminated crude oil was transported along the following pathway: from the Anchor Project, to the Amberjack Pipeline System, to the Mars Pipeline System, to the LOOP Pipeline System and storage facility, to the LOCAP Pipeline System, then finally to EMC's Baton Rouge refinery.[11]

After discovery of the contaminated oil, Plaintiffs allege that EMOC took samples of earlier batches of crude oil retained from the LOCAP and Mars Pipelines from June 2025, which allegedly "showed fluctuating levels of zinc."[12] Further, Plaintiffs aver that zinc does not typically occur naturally in produced crude oil, thus the elevated levels of zinc indicated the presence of impure substances.[13] Moreover, Plaintiffs claim that the network of pipelines connected to the Anchor Project operate under rate tariffs approved by the Federal Energy Regulatory Commission ("FERC") and the Louisiana Public Service Commission ("LPSC").[14] Thus, due to the contamination of the crude oil received by Plaintiffs and the alleged failure of Defendants to comply with the relevant FERC and LPSC tariffs governing the pipeline network, Plaintiffs bring various claims against Defendants including: breach of the warranty against redhibitory defects claims against TotalEnergies and Chevron; Louisiana Products Liability Act claims against LOOP, TotalEnergies, and Chevron; negligence claims against Chevron, TotalEnergies, Mars, LOOP, APC, LOCAP, SPC, HES, SubSea, and Wood; and a breach of contract claim against LOOP.[15]

---

[10] *Id.* at 3–5, 10.

[11] *Id.* at 3, 7–8.

[12] *Id.* at 10.

[13] *Id.*

[14] *Id.* at 7.

[15] *Id.* at 16–32.

On September 25, 2025, Plaintiffs filed a Complaint in this Court.[16] On February 25, 2026, Plaintiffs filed an Amended Complaint.[17] On that same day, TotalEnergies filed its Motion to Dismiss.[18] On February 26, 2026, Chevron filed its Motion to Dismiss.[19] On March 23, 2026, Plaintiffs filed an opposition to each motion.[20] On March 30, 2026, TotalEnergies and Chevron filed reply briefs.[21] On April 2, 2026, this Court granted Plaintiffs leave to file a sur-reply memorandum in opposition to TotalEnergies' motion.[22] On July 15, 2026, the Court heard oral arguments on the motions.

## II. Parties' Arguments

### A.   *Chevron's Motion to Dismiss*

#### 1.   Chevron's Arguments in Support of its Motion

Chevron argues that Plaintiffs fail to state a claim for relief against it: under the Louisiana Products Liability Act ("LPLA"); for breach of warranty against redhibitory defects; and for negligence.[23] Therefore, Chevron asserts that each of the claims against it should be dismissed.

Turning first to the LPLA claim, Chevron contends that Plaintiffs' arguments rely on the misplaced assumption that crude oil is a manufactured product subject to the LPLA.[24] Further,

---

[16] Rec. Doc. 1.

[17] Rec. Doc. 65.

[18] Rec. Doc. 79.

[19] Rec. Doc. 85.

[20] Rec. Docs. 87, 89.

[21] Rec. Docs. 90, 91.

[22] Rec. Doc. 98.

[23] Rec. Doc. 85-1 at 7.

[24] *Id.* at 6–7.

Chevron avers that Plaintiffs have failed to adequately allege the elements of an LPLA claim.[25] Chevron asserts that Plaintiffs fail to properly define the "specifications or performance standards" applicable to crude oil in the Amended Complaint.[26] Chevron further contends that Plaintiffs fail to demonstrate how the alleged deficiencies in the crude oil "materially deviated from [the relevant] standards so as to render it unreasonably dangerous."[27] Additionally, Chevron avers that Plaintiffs fail to sufficiently allege legal causation in regards to Chevron's role in the alleged crude oil deficiency.[28] Chevron asserts that "any zinc in the crude oil produced at the Anchor Project would have been diluted as the crude oil moved through the intricate pipeline systems that eventually connect Anchor to Exxon's refinery."[29] Accordingly, Chevron avers that Plaintiffs fail to allege that Chevron was a "substantial factor" in causing the intolerable zinc amount and unacceptable pH level.[30]

Next, Chevron asserts that Plaintiffs fail to state a redhibition claim against it.[31] Chevron contends that Plaintiffs fail to allege any "defect" in the crude oil because Plaintiffs fail to specify a baseline standard for acidity or zinc content for crude oil.[32] Furthermore, Chevron avers that Plaintiffs fail to adequately allege that such a defect actually "diminished" the usefulness of the oil, as the Amended Complaint does not allege that Plaintiffs were unable to refine the oil or sell

---

[25] *Id.* at 8.

[26] *Id.* at 9.

[27] *Id*. at 11 (quoting *Dendinger v. Covidien LP*, Civil Action No. 18-4168, 2018 WL 4462579, at *2 (E.D. La. Sept. 18, 2018)).

[28] *Id*. at 11.

[29] *Id*.

[30] *Id*. at 12.

[31] *Id*. at 13.

[32] *Id.*

the refined product.[33] Additionally, Chevron points out that a conclusory allegation that the product imposed an inconvenience "falls shorts of the necessary allegations to sustain a redhibition claim."[34]

Chevron asserts that the LPLA bars negligence claims against manufacturers for damages caused by their products if it is assumed that crude oil is a manufactured product.[35] Moreover, even if the LPLA does not bar Plaintiffs' negligence claim, Chevron asserts that Plaintiffs fail to state a claim for negligence because the Amended Complaint does not adequately allege "that Chevron had a duty to Plaintiffs or that Chevron breached any such duty."[36] Chevron asserts that Plaintiffs failed to provide any legal basis explaining "why Chevron, through the extraction of raw crude," owes any duty to Plaintiffs, absent any applicable statute, regulation, or contract.[37] Furthermore, even if such a duty did exist, Chevron avers that Plaintiffs have not adequately provided a specific standard of care from which Chevron deviated.[38] Particularly, Chevron asserts that Plaintiffs do "not allege any specific standard for the introduction of zinc in crude oil" or "explain how the crude in question may have deviated from any such specification."[39] Additionally, Chevron contends that any further amendment to the Complaint would be futile.[40]

---

[33] *Id.*

[34] *Id.*

[35] *Id.* at 14.

[36] *Id.* at 16.

[37] *Id.*

[38] *Id.* at 17.

[39] *Id.*

[40] *Id.* at 19.

**2.    Plaintiffs' Arguments in Opposition to Chevron's Motion**

In opposition to Chevron's motion, Plaintiffs argue that they have adequately alleged the required causation and defect under the LPLA, the redhibition claim, and the negligence claims. Plaintiffs reference Chevron's own admission to the press regarding Chevron's role in the contamination to support Plaintiffs' assertion that the defect exists and that Chevron caused it.[41] Plaintiffs also contend that they provided a potential explanation for Chevron's contamination, but "the exact mechanism for how Chevron introduced" the contaminant "will not be known until Plaintiffs have an opportunity to pursue discovery in this case."[42] Even if there are multiple causes of the contamination, Plaintiffs assert that Chevron may still be liable if its conduct is a substantial factor in producing the alleged harm.[43] Additionally, Plaintiffs assert that crude oil falls within the LPLA's definition of a manufactured product because the crude oil was not a raw product in its natural state when it was introduced to the pipeline.[44] Plaintiffs contend the crude oil was treated and modified to make it safe for transport, making it a manufactured product and thus making Chevron a manufacturer under the LPLA.[45]

Plaintiffs assert their redhibition claim is not barred under the LPLA because the LPLA preserves redhibition causes of action for the value of the product or other economic loss.[46]

---

[41] Rec. Doc. 89 at 5.

[42] *Id*. at 12.

[43] *Id*. at 10.

[44] *Id.* at 6.

[45] *Id.*

[46] *Id.* at 11 (citing *Price v. Luster Prods. Inc.*, No. CV 21-1036, 2022 WL 1719274, at *10 (E.D. La. May 27, 2022).

Because Plaintiffs' causes of action are not for personal injury, they assert that the redhibition cause of action may exist in tandem with the LPLA claim.[47]

Turning to the negligence claim, Plaintiffs aver that Chevron is subject to a general duty to conform its conduct to that of a reasonable person, and that they may plead a claim of negligence in the alternative in the event that Chevron is not considered a "manufacturer" under the LPLA.[48] Additionally, Plaintiffs allege that various tariffs governing the transport of crude oil on the pipeline network support the existence of Chevron's duty to Plaintiffs to exercise reasonable care.[49] In fact, Plaintiffs assert that the regulations imposed by the tariffs serve "not only to protect the individual pipelines which they govern, but also to protect the pipeline network as a whole and the end-users of the pipeline network.[50] Additionally, if the Court finds deficiencies in any of Plaintiffs' claims they request that the Court grant them leave to amend the Complaint to clarify those claims.[51]

### 3. Chevron's Arguments in Further Support of its Motion

In reply, Chevron reasserts that Plaintiffs fail to state a claim under the LPLA because crude oil does not qualify as a manufactured product under the LPLA.[52] Chevron contends that the crude oil is not "created" or "produced" and the manufacturing of products does not include "the extraction of raw natural resources, such as oil."[53] Further, Chevron avers that if the legislature

---

[47] *Id.*

[48] *Id.* at 15.

[49] *Id.* at 15-16 (citing LSPC Tariff No. 11.4.0; FERC Tariff No. 12.28.0; Non-Jurisdictional Tariff 13.12.0)

[50] *Id.*

[51] *Id.* at 17.

[52] Rec. Doc. 91 at 2.

[53] *Id.*

had intended to include raw natural resources in the statute, it would have included "extracting" in describing what constitutes "manufacturing a product."[54] Chevron contends that the case cited by Plaintiffs is distinguishable because it dealt with corn screenings which, unlike crude oil, are not naturally occurring.[55] Chevron also asserts that the "treatment" described by Plaintiffs "is simply the method by which Chevron extracts the crude and prepares it for transport," and thus, does not meet the threshold of manufacturing.[56]

Chevron reasserts that Plaintiffs fail to state a claim under the LPLA because Plaintiffs fail to specify a baseline standard for crude oil.[57] Chevron notes that the presence of impurity in the crude oil does not violate industry custom as Item No. 15 of the LOCAP tariff states "[g]ood merchantable petroleum" may contain less "than two percent (2%) of basic sediment, water, and other impurities."[58] Chevron also asserts that Plaintiffs misrepresent Chevron's statements to the press where Plaintiffs claim such statements were an acknowledgement that the zinc levels in the Mars Pipelines constituted contamination.[59] Chevron contends that the articles do not state that Chevron "admitted it violated a tariff" or admitted it was "the source of the crude oil at issue."[60] Additionally, Chevron reasserts that Plaintiffs fail to specify how the crude oil was defective.[61]

---

[54] *Id.*

[55] *Id.* at 3.

[56] *Id.* at 4.

[57] *Id.* at 5.

[58] *Id.* (citing Rec. Doc. 65 at 25).

[59] *Id.*

[60] *Id.*

[61] *Id.* at 6.

Chevron asserts that Plaintiffs fail to demonstrate how Chevron's conduct was a substantial factor in the alleged harm suffered by Plaintiffs.[62] Chevron notes that "large volumes of oil flow through the Mars Pipeline system each day" and "only a fraction" of it comes to Anchor."[63] Furthermore, "oil extracted at Anchor must pass through numerous platforms, caverns, storage sites, and pipelines" which "significantly diluted Chevron's crude, and any of which could have been contaminants."[64] Accordingly, Chevron asserts that Plaintiffs should not be entitled to discovery because Plaintiffs failed to allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[65]

Chevron reasserts that Plaintiffs fail to state a redhibition claim as the implied warranty against redhibitory defects applies only to a defect that either renders the product "useless" or "diminishes its usefulness."[66] Further, Chevron asserts that Plaintiffs are not entitled to such a redhibition claim because they failed to allege that "any defect rendered the crude oil useless or diminished its usefulness."[67]

Turning to the negligence claim, Chevron asserts that Plaintiffs fail to adequately allege that it owed a duty to Plaintiffs despite their reference to "various tariffs" and "general industry standards."[68] Specifically, Chevron contends the "various tariffs governing transport of crude oil on the pipeline network" fail to properly impose a legal duty onto Chevron as the cited tariff gives

---

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.* at 7.

[66] *Id.* (citing La. Civ. Code art. 2520).

[67] *Id.*

[68] *Id.* at 8.

"pipeline operators a right of rejection" and does not actually impose a duty.[69] Despite Plaintiffs'

reference to general industry standards, Chevron contends that they fail to define the applicable

standard.[70] Chevron also contends that Plaintiffs' alleged harm was not a reasonably foreseeable

consequence of Chevron's conduct and thus cannot be grounds for a general negligence claim.[71]

Additionally, Chevron reasserts that if the crude oil is a manufactured product, then the LPLA bars

Plaintiffs' negligence claim.[72]

## B.      TotalEnergies' Motion to Dismiss

### 1.      TotalEnergies' Arguments in Support of its Motion

TotalEnergies asserts that Plaintiffs fail to state a plausible claim against it, and therefore

requests that the Court dismiss all claims against it.[73] First, TotalEnergies incorporates by reference

each of the arguments asserted in Chevron's Motion to Dismiss.[74] TotalEnergies submits three

additional reasons for dismissal asserting that: (1) TotalEnergies "is not a 'manufacturer' under

the [LPLA] because it owns only a minority interest in the Anchor Project and is not the designated

operator[;]" (2) TotalEnergies "owed no duty to [Plaintiffs] because [TotalEnergies] had no direct

control over the operations at the Anchor Project[;]" and (3) Plaintiffs "cannot state a claim for

breach of the warranty against redhibitory defects because [they do] not allege that [they]

---

[69] *Id.*

[70] *See Id.*

[71] *Id.*

[72] *Id.* at 10.

[73] Rec. Doc. 79.

[74] *Id.* at 1.

purchased any crude oil from [TotalEnergies] or from any entity that purchased crude oil from [TotalEnergies]."[75]

TotalEnergies' first argument is that it is not liable to Plaintiffs under the LPLA because it is not a "manufacturer" of crude oil.[76] TotalEnergies points out that the Amended Complaint identifies Chevron, rather than TotalEnergies, as having a "controlling working interest in the Anchor Project."[77] Further, TotalEnergies submits that Chevron is the designated "operator" of the Anchor Project with the Bureau of Ocean Energy Management, giving Chevron "control" and "management of operations."[78] Thus, TotalEnergies asserts that because it is a non-operating working interest owner and has no control over the crude oil produced at the Anchor Project, it cannot be held liable for manufacturing defects.[79] Second, TotalEnergies contends that it is not liable to Plaintiffs for negligence because as "a non-operating working interest owner, [it] had no duty to conform the crude oil produced at the Anchor Project to any particular specification."[80] Further, TotalEnergies avers that Plaintiffs' negligence claim is barred by the LPLA, "because the LPLA provides the exclusive remedy for claims against manufacturers of allegedly [defective] products."[81] Third, TotalEnergies asserts that Plaintiffs' redhibition claim against it fails because Plaintiffs do not allege either that they purchased oil directly from TotalEnergies or that they

---

[75] *Id.* at 1–2.

[76] Rec. Doc. 79-1 at 5.

[77] *Id.*

[78] *Id.* (citing 30 C.F.R. § 550.105).

[79] *Id.*

[80] *Id.*

[81] *Id.* at 13.

purchased oil that TotalEnergies first sold to an intermediary.[82] Accordingly, TotalEnergies moves this Court to dismiss all claims against it with prejudice.[83]

### 2.    Plaintiffs' Arguments in Opposition to TotalEnergies' Motion

In opposition, Plaintiffs assert that they have stated plausible claims for relief against TotalEnergies, thus dismissal under Rule 12(b)(6) is not warranted here.[84] As an initial matter, Plaintiffs incorporate their arguments set forth in their opposition to Chevron's Motion to Dismiss, as applicable to TotalEnergies' motion.[85]

Next, Plaintiffs contend that TotalEnergies' liability under the LPLA arises from its status as a joint venturer with Chevron in relation to the Anchor Project, rather than any aspect of control over the Anchor Project.[86] Specifically, Plaintiffs aver that TotalEnergies, as a joint venturer in the Anchor Project, is jointly and severally liable under Louisiana law for the tort liabilities arising from the Anchor Project regardless of whether or not it had direct control of operations.[87] Plaintiffs offer public statements made by both Chevron and TotalEnergies concerning their partnership in the Anchor Project as evidence of those parties' intent to form a joint venture.[88] Therefore, Plaintiffs submit that they have adequately alleged a claim against TotalEnergies under the LPLA.[89]

---

[82] *Id.* at 6.

[83] *Id.*

[84] Rec. Doc. 87 at 4.

[85] *Id.*

[86] *Id.* at 5.

[87] *Id.* at 6.

[88] *Id.*

[89] *Id.* at 7.

13

Turning to the redhibition claim, Plaintiffs assert that TotalEnergies has "taken a raw product (the crude oil) and handled it and treated it in specific, technical ways that affect the quality of the crude oil."[90] Further, Plaintiffs contend that TotalEnergies made these changes to the crude oil, for the purpose of "making it safe to transport and meets the specifications set forth in the tariffs governing transport on the pipelines comprising the system in the U.S. Gulf Coast waters off Louisiana."[91] Thus, Plaintiffs aver they have adequately alleged that TotalEnergies is a "manufacturer" of the low pH and zinc contaminated crude oil at issue.[92] Therefore, Plaintiffs assert that that TotalEnergies is "legally presumed to know of the existence of this defect in the crude oil[,]" and that Plaintiffs have pled sufficient facts to support the redhibition claim.[93]

### 3.    TotalEnergies' Arguments in Further Support of its Motion

In reply, TotalEnergies reasserts the arguments made in its motion.[94] Further, TotalEnergies contends that Plaintiffs' joint venture theory does not give rise to its liability because "the model offshore drilling agreement disclaims joint-venture liability, and the [Amended Complaint] does not allege that Chevron and [TotalEnergies'] contract deviated from that industry standard."[95] Moreover, TotalEnergies avers that its lack of control over the Anchor Project, and Plaintiffs' failure to allege that the parties intended a joint venture, or shared profits or losses from the Anchor Project further insulates it from liability under Plaintiffs' joint venture theory.[96]

---

[90] *Id.* at 10.

[91] *Id.* at 11.

[92] *Id.*

[93] *Id.* at 11–12.

[94] Rec. Doc. 93.

[95] *Id.* at 6.

[96] *Id.* at 7–10.

Additionally, TotalEnergies asserts that Plaintiffs have forfeited its negligence claim against it, because Plaintiffs' opposition does not respond to TotalEnergies' argument that "it had no duty to ensure that the oil extracted complied with industry standards."[97]

### 4.    Plaintiffs' Argument in Further Opposition to TotalEnergies' Motion

In sur-reply, Plaintiffs challenge TotalEnergies' assertion that they failed to respond to its argument that it had no duty to Plaintiffs which could give rise to a negligence claim.[98] Plaintiffs point to the fact that they incorporated the arguments in opposition to Chevron's motion to dismiss by reference, including the argument regarding TotalEnergies and Chevron's negligence liability as joint venturers.[99]

### III. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides that an action may be dismissed for "failure to state a claim upon which relief can be granted."[100] A motion to dismiss for failure to state a claim is "viewed with disfavor and is rarely granted."[101] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[102] "Factual allegations must be enough to raise a right to relief above the speculative level."[103] A claim is facially plausible when the plaintiff has pleaded facts that allow

---

[97] *Id.* at 12.

[98] Rec. Doc. 93 at 1.

[99] *Id.* at 1–2.

[100] Fed. R. Civ. P. 12(b)(6).

[101] *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).

[102] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[103] *Twombly*, 550 U.S. at 555.

the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[104]

On a motion to dismiss, asserted claims are liberally construed in favor of the claimant, and all facts pleaded are taken as true.[105] However, although required to accept all "well-pleaded facts" as true, a court is not required to accept legal conclusions as true.[106] "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."[107] Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not suffice.[108] The complaint need not contain detailed factual allegations, but it must offer more than mere labels, legal conclusions, or formulaic recitations of the elements of a cause of action.[109] That is, the complaint must offer more than an "unadorned, the-defendant-unlawfully-harmed-me accusation."[110] From the face of the complaint, there must be enough factual matter to raise a reasonable expectation that discovery will reveal evidence as to each element of the asserted claims.[111] If factual allegations are insufficient to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an "insuperable" bar to relief, the claim must be dismissed.[112]

---

[104] *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556).

[105] *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).

[106] *Iqbal*, 556 U.S. at 678–79.

[107] *Id.* at 679.

[108] *Id.* at 678.

[109] *Id.*

[110] *Id.*

[111] *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009).

[112] *Carbe v. Lappin*, 492 F.3d 325, 328 n.9 (5th Cir. 2007); *Moore v. Metro. Hum. Serv. Dist.*, No. 09-6470, 2010 WL 1462224, at * 2 (E.D. La. Apr. 8, 2010) (Vance, J.) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

## IV. Analysis

TotalEnergies and Chevron move the Court to dismiss the claims against them, asserting that Plaintiffs have failed to state plausible LPLA, redhibition, or negligence claims against them. Plaintiffs contend that all three claims have been sufficiently pled against both TotalEnergies and Chevron. Accordingly, the Court addresses the viability of each claim in turn against TotalEnergies and Chevron (collectively, the "Anchor Project Defendants").

### A.    *Louisiana Product Liability Claims*

Beginning with the LPLA claims, the Amended Complaint alleges that the Anchor Project Defendants are liable under the LPLA "because low pH and contaminated crude oil was unreasonably dangerous in its construction and/or composition, and [Plaintiffs] suffered damages as a result of their reasonable use of the product."[113] Further, the Amended Complaint asserts that the Anchor Defendants are "manufacturer[s]" under the LPLA and that the contaminated crude oil is a "product" under the LPLA.[114]

The Anchor Project Defendants argue that: crude oil is not a manufactured product subject to the LPLA; Plaintiffs fail properly define the "specifications or performance standards" applicable to crude oil, or how the Anchor Project Defendants deviated from said standards; and Plaintiffs fail to allege how the Anchor Project Defendants caused any such deficiency. Additionally, TotalEnergies asserts that it "is not a 'manufacturer' under the Louisiana Products Liability Act because it owns only a minority interest in the Anchor Project and is not the designated operator."[115]

---

[113] Rec. Doc. 65 at 19.

[114] *Id.* at 21.

[115] Rec. Doc. 79 at 1.

17

Under the LPLA, "[a] product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer."[116] Turning first to TotalEnergies assertion that it is not a "manufacturer[,]" it is true that the LPLA "only applies to manufacturers."[117] "Generally, a manufacturer is 'a person or entity who is in the business of manufacturing a product for placement into trade or commerce.'"[118] "Manufacturing a product" means "producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product."[119] However, by definition, "a manufacturer includes a seller in two circumstances: (1) when the seller exercises control over a characteristic of the product's design, construction, or quality; and (2) when the seller imports and distributes products of a foreign manufacturer if the seller is the manufacturer's alter ego."[120]

The Court first considers Chevron's assertion that crude oil is not a manufactured product under the LPLA. Plaintiffs point out that the Amended Complaint alleges that Chevron "treated and modified the crude oil at the well/platform prior to placing it into the pipeline network and into commerce."[121] Thus, Plaintiffs contend that the crude oil was transformed from a raw material to a manufactured product prior to leaving Chevron's control. Clearly, significantly refined

---

[116] *Dendinger v. Covidien, LP*, No. 18-4168, 2018 WL 4462579, at *2 (E.D.L.A. Sept. 18, 2018) (quoting La. Rev. Stat. § 9:2800.55).

[117] *Pickard v. Amazon.com, Inc.*, 2023-01596 (La. 6/28/24), 387 So. 3d 515, 518 (citing La. Rev. Stat. § 9:2800.52).

[118] *Id.* (quoting La. Rev. Stat. § 9:2800.53(1)).

[119] *Id.*

[120] *Id.*

[121] Rec. Doc. 89 at 6.

petroleum products such as gasoline are "manufactured products" under the LPLA.[122] However, neither party has cited any authority, and this Court has been unable to locate any authority, establishing how much modification crude oil needs to undergo before it is considered a "manufactured product" under the LPLA. At the motion to dismiss stage, Plaintiffs have pled sufficient facts to allege that Chevron is a manufacturer of the manufactured product of crude oil under the LPLA.

As to the LPLA elements of defect and causation, the Amended Complaint alleges that the zinc and pH levels of the crude oil was "out-of-specification, based on general industry accepted practice[,]" and suggests that zinc bromide may have been released into the oil during the completion of the Anchor Project well construction.[123] Thus, Plaintiffs have adequately alleged causation and damages by claiming that the contaminated crude oil may have been caused by Chevron using zinc bromide while finishing the oil well, which caused damaged to Plaintiffs' pipelines and facility.[124]

Under the LPLA, a claimant must also show "not only what a manufacturer's specifications or performance standards are for a particular product, but how the product in question materially deviated from those standards so as to render it 'unreasonably dangerous.'"[125] Here, Plaintiffs allege that testing revealed excess zinc levels ranging from 9.3 to 14.2 parts per million, which Plaintiffs allege violated general industry standards.[126] Chevron does not cite any authority to

---

[122] *In re Methyl Tertieary Butyl Ether (MTBE) Prods. Liab. Litig.*, 379 F. Supp. 2d 348. 408 (S.D.N.Y. 2005) (Dismissing all non-LPLA claims concerning allegedly defective gasoline because the LPLA precluded the other claims).

[123] Rec. Doc. 65 at 9, 12.

[124] *Id.* at 9.

[125] *Lyles v. Medtronic Sofamor Danek, USA, Inc.*, 871 F.3d 305, 311 (5th Cir. 2017).

[126] Rec. Doc. 65 at 10.

support its assertion that this allegation is insufficient to state a claim under the LPLA. Accordingly, the Court finds that Plaintiffs have alleged sufficient facts to state a claim against Chevron under the LPLA.

With respect to the LPLA claim against TotalEnergies, Plaintiffs concede that its liability does not arise from any control over the Anchor Project, instead asserting that TotalEnergies' vicarious liability arises from its status as a joint venturer with Chevron in relation to the project.[127] "A joint venture has been defined as 'a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.'"[128] "The existence or nonexistence of a joint venture is a question of fact, although what constitutes a joint venture is a question of law."[129] "No formal or specific agreement is required. Generally, the relationship may be formed by an oral agreement and the existence of a joint venture may be inferred from the conduct of the parties and other circumstances."[130] In Louisiana, the law of partnership applies to joint ventures.[131] Pursuant to Louisiana Civil Code article 2817, "[a] partner is bound for his virile share of the debts of the partnership but may plead discussion of the assets of the partnership."

Plaintiffs rely on public statements made by the Anchor Project Defendants along with their shared ownership interest in the project as evidence of the existence of a joint venture.

---

[127] Rec. Doc. 87 at 5–7. The Amended Complaint asserts that Chevron the Anchor Project Defendants are joint venturers who are vicariously liable for the tortious conduct of each other. Rec. Doc. 65 at 22.

[128] *Coffee Bay Investors, LLC v. W.O.G.C., Co.*, 2003-0406 (La. App. 1 Cir. 4/2/04), 878 So. 2d 665 (quoting *Grand Isle Campsites, Inc. v. Cheek*, 262 So. 2d 350, 355 (1972)).

[129] *Id.* (citing *Grand Isle Campsites, Inc.*, 262 So. 2d 350, 355 (1972)).

[130] *Tedeton v. Tedeton*, 46,901 (La. App. 2 Cir. 2/8/12), 87 So. 3d 914, 924.

[131] *Id.*

TotalEnergies disputes that a joint venture exists, while Chevron admits that one does exist.[132] Further, TotalEnergies asserts that the model agreement that parties often use in these situations "unambiguously provides that '[t]he obligations, duties, and liabilities of the Parties under this Agreement are several and not joint or collective,' and that 'nothing in th[e] Agreement shall be construed to create a partnership, joint venture, association, or other form of business entity recognizable in law for any purpose.'"[133] However, during oral argument on July 15, 2026, TotalEnergies admitted that it had not yet disclosed the actual agreement it has with Chevron to Plaintiffs. Instead, TotalEnergies submitted that it had provided a description of the agreement to Plaintiffs. Federal Rule of Civil Procedure 26(a)(1)(A)(ii) provides that:

> a party must, without awaiting a discovery request, provide to the other parties . . . a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses[.]

Therefore, TotalEnergies appears to have complied with Rule 26's initial disclosure requirement by providing Plaintiffs with the description of the agreement governing its relationship with Chevron. However, TotalEnergies' assertion that this claim should be dismissed before the document is produced is flawed. Once the actual agreement has been disclosed it may support or undermine the existence of a joint venture. Hence, the fact that the actual agreement has not yet been disclosed reinforces the impropriety of dismissing the claims against TotalEnergies on a Rule 12(b)(6) motion. The issue of whether a joint venture exists is a question of fact that cannot be resolved on a motion to dismiss. Accordingly, the Court denies TotalEnergies' motion to the extent it seeks dismissal of the LPLA claim against it.

---

[132] Rec. Doc. 79-1 at 10; Rec. Doc. 89 at 2.

[133] *Id.* at 11.

**B.      Redhibition Claims**

Turning to the redhibition claims, similar to the LPLA claims, the Anchor Project Defendants assert that this claim fails because Plaintiffs fail to allege the standard for acidity or zinc content and therefore have not alleged a defect in relation to that standard. Further, the Anchor Project Defendants aver the redhibition claims fail because Plaintiffs have not alleged that the contamination of the crude oil diminished the usefulness of the oil. In opposition, Plaintiffs assert that Chevron admitted that "a new well start up" was a source of contaminated crude oil being transported in the Mars pipeline, and that it had begun "measuring zinc levels within acceptable limits[,]" in news reports released in July 2025.[134] Further, Plaintiffs contend that the Amended Complaint adequately alleges that that the contaminated crude oil caused damage to them.

Louisiana Civil Code article 2520 provides a cause of action against manufacturers for breach of "warranty against redhibitory defects." "The Code defines 'redhibitory defects' as those defects that 'render[ ] the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect.'"[135] "The remedy for such a breach of warranty is [recission] of the contract."[136] "If the seller knew of the defect, he could also be liable for damages and attorney's fees."[137] "If the seller is also the manufacturer of the product, the seller is conclusively presumed to know of the defect."[138] The LPLA provides that it "establishes the exclusive theories of liability for manufacturers for damages caused by their

---

[134] Rec. Doc. 89 at 12.

[135] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 251 (5th Cir. 2002) (citing La. Civ. Code art. 2520).

[136] *Id.*

[137] *Id.*

[138] *Id.*

products."[139] The statute defines "damage" by explicitly excluding amounts recoverable under redhibition for damage to the product and other economic loss.[140] "Courts have interpreted the LPLA as preserving redhibition as a cause of action only to the extent the claimant seeks to recover the value of the product or other economic loss."[141]

As an initial matter, the redhibition claims alleged in the Amended Complaint are consistent with the parameters within which such claims may be pled in tandem with a LPLA claim, because Plaintiffs are only seeking damages related to their economic losses. As to the sufficiency of the defect alleged, the Amended Complaint clearly alleges that the crude oil was contaminated and caused Plaintiffs damage to their already held oil and their facility. In fact, the Amended Complaint also alleges that due to the issues caused by the contaminated oil, the United States Department of Energy authorized the "release of up to 1 million barrels of crude oil from the Strategic Petroleum Reserve to EMOC under an exchange agreement. Under this exchange agreement, EMOC is obligated to eventually return the quantity of crude oil released to it from the Strategic Petroleum Reserve plus additional barrels."[142] The Anchor Project Defendants have not cited an authority to support their assertion that an exact standard must be alleged to state a redhibition claim, nor has this Court located such an authority.

TotalEnergies also argues that this claim fails against it because Plaintiffs do not allege either that they purchased oil directly from TotalEnergies or that they purchased oil that TotalEnergies first sold to an intermediary. "In Louisiana, the warranty against redhibitory defects

---

[139] La. Rev. Stat. art. § 9:2800.52.

[140] *See* La. Rev. Stat. § 9:2800.53(5).

[141] *Pipitone*, 288 F.3d at 251 (5th Cir. 2002) (internal citations omitted).

[142] Rec. Doc. 65 at 15–16.

23

is implied in every sale unless validly waived."[143] A buyer's action for a redhibitory claim extends "to all sellers in the chain of sales back to the primary manufacturer."[144] As discussed above in relation to the LPLA claim, the issue of whether TotalEnergies was the "manufacturer" of the crude oil is a factual question that cannot be resolved on a motion to dismiss. Accordingly, the Court denies the instant motions insofar as they seek dismissal of the redhibition claims.

## C.    Negligence Claims

Turning to the negligence claims, the Anchor Project Defendants assert that the LPLA bars these claims. Further, even if the LPLA does not bar the negligence claims, the Anchor Project Defendants contend that these claims fail because the Amended Complaint does not allege a duty owed, or a breach of said duty. Plaintiffs aver that the Anchor Project Defendants are subject to a general duty to conform their conduct to that of a reasonable person, and Plaintiffs may plead a claim of negligence in the alternative in the event that the Anchor Project Defendants are not considered manufacturers under the LPLA.

Under Louisiana law a plaintiff asserting a negligence claim must prove the following elements:

(1) the defendant's conduct was cause in fact of the plaintiff's injuries;
(2) the defendant had a duty to conform conduct to a specific standard;
(3) the defendant breached that duty;
(4) the defendant's conduct was the legal cause of plaintiff's injuries; and
(5) plaintiff sustained actual damages.[145]

As discussed above, the issue of whether the Anchor Project Defendants are manufacturers under the LPLA cannot be resolved on a motion to dismiss. The LPLA provides that it "establishes

---

[143] *Deloach Spray Foam Insulation, LLC v. Briggs & Stratton, Corp.*, 645 F. Supp. 3d 563, 570 (W.D. La. 2022).

[144] *Womack & Adcock v. 3M Bus. Prods. Sales, Inc.*, 316 So. 2d 795, 796 (La. App. 1 Cir. 1975).

[145] *Fruge v. ONOB, Inc.*, 09-1028 (La. App. 3 Cir. 3/10/10), 32 So. 3d 1115, 1118.

the exclusive theories of liability for manufacturers for damages caused by their products."[146] However, there are factual questions in dispute regarding whether Chevron and TotalEnergies may be held liable as manufacturers under the LPLA. Where there are facts in dispute regarding whether an entity is a manufacturer under the LPLA, courts have found that negligence may be pled as an alternative theory of liability.[147]

"Under Louisiana law, the existence of a duty presents a question of law that 'varies depending on the facts, circumstances, and context of each case and is limited by the particular risk, harm, and plaintiff involved.'"[148] The parties' chief dispute is whether the elements of duty and breach have been adequately pled in the Amended Complaint. The Amended Complaint alleges the Anchor Project Defendants owed a general duty of reasonable care and a duty to ensure the crude oil placed in the pipeline conformed to industry standards and the various rules, regulations, and rate tariffs governing the pipelines, to Plaintiffs and other downstream recipients of the crude oil shipped on the pipeline network. Further, the Amended Complaint alleges that the Anchor Project Defendants' breach of this duty was the cause of Plaintiffs' damages.[149] Specifically, Plaintiffs cite various tariffs for which other Defendants are the tariff holder.[150] However, Plaintiffs fail to cite any authority that would allow a duty to arise from a tariff and be imposed on an entity that is not the tariff holder. Nevertheless, the Fifth Circuit has held that

---

[146] La. Rev. Stat. art. § 9:2800.52.

[147] *Becnel v. Mercedes-Benz USA, LLC*, No. 14-0003, 2014 WL 1918468, * 8–9 (E.D. La. May 13, 2014); *Kline v. Nielsen & Hiebert Sys., Inc.*, No. 12-1412, 2012 WL 5288137, at *2 (W.D. La. Oct. 23, 2012)

[148] *Burszitajn v. United States*, 367 F.3d 485, 489 (5th Cir. 2004) (quoting *Dupre v. Chevron U.S.A., Inc.*, 20 F.3d 154, 157 (5th Cir. 1994)).

[149] Rec. Doc. 65 at 23–24.

[150] Rec. Doc. 89 at 15-16 (citing LSPC Tariff No. 11.4.0; FERC Tariff No. 12.28.0; Non-Jurisdictional Tariff 13.12.0).

"[i]ndustry standards are relevant to determining the existence of a duty."[151] "Evidence of custom within a particular industry, group, or organization is admissible as bearing on the standard of care in determining negligence."[152] "Compliance or noncompliance with such custom, though not conclusive on the issue of negligence, is one of the factors the trier of fact may consider in applying the standard of care."[153] Hence, Plaintiffs have adequately pled that the Anchor Project Defendants had a duty of reasonable care governed by industry standards and that allowing contaminated crude oil to flow from the Anchor Project was a breach of that duty. Therefore, the Court denies the motion to the extent that it seeks the dismissal of the negligence claims.

### V. Conclusion

For the reasons stated above the Court finds that Plaintiffs have pled plausible factual allegations to support their negligence, LPLA, and redhibition claims against the Anchor Project Defendants.

Accordingly,

**IT IS HEREBY ORDERED** that Chevron's Motion to Dismiss[154] is **DENIED**.

**IT IS FURTHER ORDERED** that TotalEnergies' Motion to Dismiss[155] is **DENIED.**

**NEW ORLEANS, LOUISIANA,** this __21st__ day of July, 2026.

_Nannette Jolivette Brown_
**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[151] *Dunn v. Bd. of Commissioners of Port of New Orleans*, 2025-0201 (La. App. 4 Cir. 12/3/25), 430 So. 3d 438, 442 (citing *Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178, 1180–81 (5th Cir. 1975)).

[152] *Muncie Aviation Corp*, 519 F.2d at 1180.

[153] *Id.* at 1180–81.

[154] Rec. Doc. 85.

[155] Rec. Doc. 79.